AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

<table>
<tr><td>LODGED<br>CLERK, U.S. DISTRICT COURT<br>09/26/2022<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___ AP ___ DEPUTY</td></tr>
</table>

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT
9/26/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ KC ___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>Curtis Jeffery Mosley, Jr., and<br>Richard Joaquin Pelayo<br><br>Defendant | Case No.  5:22-mj-00620 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 7, 2022 in the county of San Bernardino, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2113(a);<br>924(c)(1)(A)(ii); and 2(a) | Armed Credit Union Robbery;<br>Brandish a Firearm in Furtherance of,<br>and During and in Relation to, a<br>Crime of Violence; and Aiding and<br>Abetting |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Dane Wilkinson, FBI Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    September 26, 2022

_____
*Judge's signature*

City and state:    Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
_____
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Dane Wilkinson, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.  This affidavit is made in support of a criminal complaint and arrest warrants against Curtis Jeffery Mosley, Jr. ("MOSLEY") and Richard Joaquin Pelayo ("PELAYO") for violations of 18 U.S.C. §§ 2113(a), (d) (Armed Credit Union Robbery); 924(c)(1)(A)(ii) (Brandish a Firearm in Furtherance of, and During and in Relation to, a Crime of Violence); and 2(a) (Aiding and Abetting).

2.  This affidavit is also made in support of an application for a warrant to search 480 Wier Road, Apt. #12, San Bernardino, California 92408 ("SUBJECT PREMISES A") as described more fully in Attachment A-1, and the person of MOSLEY, as described more fully in Attachment A-2, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2113(a), (d) (Armed Credit Union Robbery); 1951(a) (Interference with Commerce by Robbery and Conspiracy); 922(g) (Felon in Possession of Firearm and Ammunition); 924(c) (Possess, Use, Carry, or Brandish a Firearm in Furtherance of, and During and in Relation to, Crimes of Violence); 371 (Conspiracy to Commit Credit Union Robbery); and 2(a) (Aiding and Abetting) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.    This affidavit is also made in support of an application for a warrant to search 970 N. Mayfield Ave., San Bernardino, California 92410 ("SUBJECT PREMISES B") as described more fully in Attachment A-3, and the person of PELAYO, as described more fully in Attachment A-4, for evidence, fruits, or instrumentalities of the Subject Offenses, as described more fully in Attachment B.  Attachments A-3, A-4, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I have been employed as a Peace Officer in the state of California for approximately 16 years.  I am currently employed by the Riverside Police Department and am assigned as a Task Force Officer ("TFO") assigned to the FBI Violent Crime Suppression Task Force ("IVCSTF").  During my career, I have worked as a Patrol Officer, SWAT team member, Detective and Sergeant.  In those roles, I have had considerable experience interacting with and arresting known and/or admitted criminals.

I have investigated residential and commercial burglaries, grand theft, and identity theft.  I have also investigated crimes against persons like armed robberies, sexual abuse, physical abuse, rapes, and domestic violence.  I have also investigated violent crimes like armed robbery.

6.    In connection with my current assignment with IVCSTF, I have participated in multiple types of investigations in which I have used a variety of investigative techniques, including interviewing suspects and witnesses, speaking with law enforcement agents and officers, conducting and reviewing electronic surveillance, executing arrest and search warrants, analyzing telephone records, and collecting and reviewing physical evidence.  From my years of experience and training, I am familiar with the methods used by individuals engaging in illegal activities, and specifically, familiar with methods used by armed robbers.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On the morning of April 7, 2022, an armed robber, later identified by DNA match as MOSLEY, and a getaway driver, later identified by DNA match as PELAYO, robbed a SchoolsFirst Credit Union Branch that was inside a Stater Brothers grocery store in San Bernardino, California.  MOSLEY and PELAYO pulled up to the Stater Brothers store in a white, Ford E-350 van. PELAYO waited in the driver's seat of the van while MOSLEY, brandishing a handgun, went inside and robbed the Credit Union. MOSLEY robbed the Credit Union by forcing Credit Union employees—at gunpoint—to open a safe and empty its contents.

While MOSLEY was inside, a witness took a photograph of PELAYO, who was sitting in the getaway van, depicting PELAYO brandishing what appears to be a black handgun.

8.    After the armed robbery, MOSLEY and PELAYO fled the scene, but they were delayed when they struggled to switch getaway vehicles.  Ultimately, MOSLEY and PELAYO abandoned some of their clothes, a loaded handgun, and the money they had stolen in a dumpster and fled.  Investigators recovered clothing MOSLEY and PELAYO discarded, and further investigation revealed their DNA was on some of that clothing.  Male DNA was also found on the loaded handgun recovered from the dumpster, but there was not enough DNA on the handgun to enter the DNA sample into the Combined DNA Index System ("CODIS") to determine whether MOSLEY or PELAYO's DNA was on the handgun.  Accordingly, to determine whether MOSLEY or PELAYO's DNA was on the handgun, the lab will need DNA samples from MOSLEY and PELAYO to perform direct comparisons.

9.    After identifying MOSLEY and PELAYO, investigators located them and surveilled them.  Investigators discovered that MOSLEY resides at SUBJECT PPREMISES A and PELAYO resides at SUBJECT PREMISES B.  Based on my training and experience, even though MOSLEY and PELAYO discarded some of the evidence related to the robbery, I expect officers will find additional evidence at SUBJECT PREMISES A and SUBJECT PREMESIS B, including distinct appearing shoes that MOSLEY wore during the robbery and distinct camouflage-style pants PELAYO wore during the robbery.  While executing the requested search warrants, I also expect officers

will discover, among other items of evidentiary value, evidence of the connection between MOSLEY and PELAYO, evidence relating to the second firearm PELAYO brandished during the robbery, evidence revealing how either firearm used was acquired or discarded, and evidence of the planning and execution of the robbery.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my reliance on law enforcement reports, my review surveillance footage, my conversations with other law enforcement agents, and my own knowledge of the investigation, I believe the following to be true:

### A.   Robbery of SchoolsFirst Federal Credit Union located inside Stater Brothers in San Bernardino, California on April 7, 2022 at 09:10 a.m.

11.   On April 7, 2022 at approximately 9:10 a.m., a Black male, later identified as MOSLEY based on a DNA match, standing approximately 5'10" tall and weighing approximately 200 pounds, wearing a grey hat with the words "Segovia Disposal, Inc.," a black neck gator, a black jacket, black gloves, blue jeans, a pair of black shoes with white soles, and brandishing a black handgun with a silver slide, exited the rear passenger side of a white, Ford E-350 van and entered into the Stater Brothers store located at 161 E 40th Street, San Bernardino, California.[1]

---

[1] MOSLEY's description is based on the eyewitness accounts. The description of his clothing is based both on eyewitness accounts and my own review of the of video surveillance from the robbery.

12.   While getting out of the van and entering the Stater Brothers, MOSLEY pointed the handgun at customers, workers, and security guards.   MOSLEY then walked directly to the SchoolsFirst Federal Credit Union branch located inside the Stater Brothers.   Below are screenshots of security footage showing MOSLEY brandishing the handgun with a silver slide as he entered the Stater Brothers and as he demanded cash from Credit Union branch employees:

 

/// 
/// 
///

13.   Once inside the Credit Union branch, MOSLEY directed several of the workers, at gun point, into the back room of the Credit Union branch where the Credit Union branch safe is located.  Once in the back room, witnesses reported that MOSLEY ordered the branch supervisor, S.H., and a branch employee, A.R., to open the safe.  S.H. and A.R. complied, and once the safe was open, MOSLEY ordered M.A., another branch employee, to hold a bag while S.H. and A.R. placed the money inside.

14.   Two other employees, R.N. and J.C., were held at gunpoint during the incident but were able to trigger the silent alarm while S.H. and A.R. filled the bag with the money from the safe.  With the bag of cash in hand, MOSLEY then ran out of the Stater Brothers store and got into the getaway van.

15.   While MOSLEY was inside the Stater Brothers robbing the credit union, a nearby witness, R.R., took a photograph of the getaway driver, later identified as PELAYO based on a DNA match.  As R.R. took the photograph, R.R. reported that PELAYO pointed a handgun at R.R.  R.R. described PELAYO as a Hispanic male, wearing a blue baseball cap with an emblem in the front, a black and grey sweater, and a black face mask.  Below is the photograph R.R. took, and below that photograph is a zoomed-in version of the photograph with the color adjusted to increase the contrast and to better show the black handgun R.R. saw PELAYO pointing:





**B.   MOSLEY and PELAYO Fail to Switch Vehicles and Then Discard Clothes, Gun, and Cash in Dumpster**

16.   After MOSLEY got into the waiting getaway van, surveillance footage shows the getaway van speed off to the southeast side of the Stater Brothers parking lot and then out of view of the camera.  Arriving investigators found the getaway van, abandoned, near where it was last seen coming out of the view of camera footage.  Investigators discovered the getaway van had recently been stolen.

17.   An eyewitness reported to responding officers that two individuals, a Black male and a smaller Hispanic male, walked into the apartment complex that was just south of the Stater Brothers and put something inside of a dumpster at the end of an alley way.

18.   Officers located the dumpster and found a Smith and Wesson 9mm handgun with a black frame and a silver slide, loaded with 15 rounds of 9mm ammunition (including one round in the chamber), a grey hat with the words "Segovia Disposal, Inc.," a blue hat bearing the California state flag emblem, a black and grey sweater, a black bag with zebra print interior lining containing approximately $49,676 in cash, and a pair of all black gloves.[2]  No suspects were identified in the area during the on-scene investigation.  During the investigation, however, investigators found surveillance footage of the dumpster and the footage shows MOSLEY and PELAYO discarding articles of clothing

---

[2] The StudentsFirst Credit Union Branch audit shows $49,676 was taken by the robbery suspect and surveillance shows the robbery suspect had the cash in a black bag with zebra print interior lining.

into the same dumpster in which the handgun, bag of money, and other evidence was located.  Video surveillance shows PELAYO wearing distinct, camouflage-style pants, which he did not discard and were not recovered.  Surveillance shows MOSLEY wearing black shoes with white soles that he did not discard and were not recovered.

19.   During follow-up investigation, officers discovered video surveillance footage of MOSLEY and PELAYO approaching a maroon, Ford F-250, after fleeing the getaway van, but then abandoning the Ford F-250.  During follow-up investigation, investigators discovered surveillance video from before the robbery showing a suspect, who appears to be PELAYO, stage the maroon F-250 before the robbery.  The surveillance video shows that it took an atypically long time for the driver to parallel park the maroon F-250, which suggests the driver was not accustomed to driving a large truck.  The person who parked the maroon F-250 then got into a white Ford van—the same type of van that was used during the robbery.  I suspect MOSLEY and PELAYO staged the maroon F-250, which was stolen, before the robbery and planned to use it as a getaway vehicle.  I also suspect they experienced some sort of issue operating the maroon F-250.  In my training and experience, it is common for robbers to switch vehicles from a "hot" vehicle (seen by witnesses at the scene of a robbery) to a "cold" vehicle (that is not tied to the robbery) that is staged nearby.  It is also common for robbers to use stolen vehicles because those vehicles are harder to trace back to robbery suspects.

20.   After MOSLEY and PELAYO could not get away in the stolen Ford F-250, various surveillance cameras captured them walking around the nearby apartment complex.  At one point, surveillance footage captures MOSLEY and PELAYO banging on a screen door within the apartment complex and saying something to the effect of, "It's Rich" or "It's Rick."  This detail is significant because PELAYO's first name is Richard.

**C.   DNA Results**

21.   SA Estevan Banuelos sent the DNA swabs taken from the items MOSLEY and PELAYO discarded in the dumpster near the apartment complex to the FBI DNA laboratory in Quantico, Virginia for testing and received the following results:

a.   The grey hat with the words "Segovia Disposal, Inc." came back with DNA on it that was entered into CODIS and came back with a positive match to MOSLEY.  The surveillance footage retrieved from Stater Brothers shows that MOSLEY was wearing that hat.  MOSLEY also matches the physical description of the suspect who committed the robbery.

b.   The black gloves came back with DNA on them that was entered into CODIS and came back with a positive match to PELAYO.  The gloves were found along with the black bag containing approximately $49,676 in cash, and a jacket that appears to be the jacket PELAYO was wearing in the photograph that R.R. captured.  That photograph R.R. took also shows that PELAYO was wearing black gloves.  PELAYO also matches the physical description of the getaway driver.

   c. The FBI DNA laboratory found three male DNA profiles on the handgun, but a direct comparison is needed to establish whether PELAYO or MOSLEY are contributors to any of the DNA profiles.  For that purpose, I seek authorization in Attachments A-2, A-4, and B to collect DNA samples from PELAYO and MOSLEY for direct comparison against DNA found on the handgun.

  **D. Investigation of Connection Between MOSLEY and PELAYO**

  22. Efforts by investigators to connect MOSLEY and PELAYO have revealed that members of MOSLEY's family share mutual friends with PELAYO on social media sites.  I believe that a search of SUBJECT PREMISES A and SUBJECT PREMISES B, and digital devices recovered, will reveal additional evidence of their connections, phone numbers they had used, and evidence of communication between MOSLEY and PELAYO.

  **E. StudentsFirst Credit Union is Federally Insured**

  23. On September 20, 2022, SA Banuelos spoke with Zachary Dunn, Physical Security Specialist for the San Bernardino County region via telephone.  Dunn confirmed that as of April 7, 2022, the StudentsFirst Credit Union Branch that was robbed was federally insured through the National Credit Union Administration ("NCUA").

  **F. Investigation of Similar Robberies**

  24. On or about March 5, 2022 a Black male of similar stature to MOSLEY robbed a Stater Brothers store located at 1045 N. Garey Ave., Pomona, California.  In this robbery, the suspect appears to be wearing the same black jacket, black shoes with

white soles, and brandishing a similar firearm used during the
April 7, 2022 robbery.  The suspect was also seen driving a
white Nissan Rogue, with the license plates removed, in security
footage.  During surveillance of MOSLEY, investigators saw him
driving a white Nissan Rogue.

25.  On or about March 3, 2022, a Black male of similar
stature to MOSLEY robbed a DD's Discounts store located at 1617
E. Highland Ave., San Bernardino, California.  The suspect
appears to be wearing the same black jacket, shoes with white
soles, and brandishing a similar firearm used during the April
7, 2022 robbery.  Security footage also captured the suspect
driving a white Nissan Rogue with the license plate removed.

26.  On or about December 14, 2021, a Black male of similar
stature to MOSLEY used a stolen Ford F-250 to crash a battering-
ram-style hitch into the rear window of a Wells Fargo bank
located at 334 W. 3rd St. San Bernardino, California.  The
robber was wearing a yellow safety vest, a hat, mask, gloves,
and brandished a black firearm with a silver slide, similar to
the firearm used in the April 7, 2022 robbery.  The suspect
demanded money from the manager, and ultimately took
approximately $8,452.  The robber then drove to the end of the
parking lot, got into a waiting getaway vehicle, and the getaway
vehicle fled the scene.  No suspects were found.  I believe
MOSLEY may have committed this robbery because he used the same
type of vehicle, a Ford F-250, that he tried to steal while
fleeing the scene after the April 7, 2022 robbery.

### G.   MOSLEY's Prior Robberies Involving Similar Methods to the April 7, 2022 Robbery

27.   MOSLEY was convicted of an August 2007 armed bank robbery where he used a stolen F-350 as the getaway vehicle. The facts of that robbery are outlined in an unpublished California Court of Appeals opinion affirming MOSLEY's jury trial convictions relating to the August 2007 robbery, while finding evidence insufficient to sustain other convictions. *People v. Mosley*, No. D062033, 2013 WL 6860590, at *5 (Cal. Ct. App. Dec. 31, 2013) (unpublished).

28.   The August 2007 robbery was an armed robbery of a Wells Fargo Bank in Palm Springs.  In that robbery, a robber, who matched the description of MOSLEY's brother, Maverick Mosley, used a silver handgun to rob the tellers and then ran out of the bank and got into a white Ford F-350.[3]  Immediately after that robbery, a witness saw two suspects transferring from a white F-350 that they had used as a getaway vehicle and getting into a minivan.  Local law enforcement officers located the minivan, and as they began to follow it, they noticed an object fly out of the minivan.  Officers then attempted to initiate a traffic stop.  After initially stopping, as officer approached the van on foot, the minivan sped off and a police pursuit ensued.  While swerving in response to officer-initiated pursuit techniques, the van hit a curb and then crashed. Officers directed three vehicle occupants out of the minivan:

---

[3] I believe MOSELY is familiar with Ford F-250s, F-350s, and Ford E-350 vans and how to steal them.  That is why, I believe, he has repeatedly used large Ford vehicles in each of his robberies.

MOSLEY was the driver, his brother was as passenger, and another suspect was also a passenger.  Along the path that the minivan had traveled, officers found a loaded silver handgun.  MOSLEY was convicted of the August 2007 robbery and his sentence was enhanced based on a prior "strike" (another prior robbery conviction) and a firearm enhancement.

29.  On or about July 6, 2014, MOSLEY was convicted of burglary and a series of receiving stolen property offenses after committing a string of robberies in the Riverside County area, where in 2011, he used a stolen Ford E-350 Econoline van, similar to the van used during the April 7, 2022 robbery. According to court records, MOSLEY committed these crimes while on bond pending sentencing in his prior robbery case and MOSLEY's sentence included an enhancement for committing a new felony while on bail under California Penal Code Section 12022.1.

**H. Background and Criminal History of MOSLEY**

30.  On or about September 25, 2022, I reviewed certified conviction records for MOSLEY and learned that MOSLEY has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of San Bernardino, case number FSB036655, on or about April 16, 2003.  MOSLEY was sentenced to 2 years' prison in this case.

b.    Evading an Officer, in violation of California Vehicle Code Section 2800.2(a), in the Superior Court for the State of California, County of San Bernardino, case number FBA008425, on or about April 26, 2005.  MOSLEY was sentenced to 3 years' prison in this case.

c.    Two counts of Second Degree Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Riverside, case number INF059631, on or about July 21, 2011.  Both of these conviction included sentencing enhancements for being armed with a firearm in the commission of the crime under California Penal Code Section 12022(a)(1) and a 5-year sentencing enhancement for a serious felony conviction after sustaining a prior serious felony conviction.  On one count MOSLEY was sentenced to 6 years' prison and on the other he was sentenced to 2 years' prison.

d.    Burglary, in violation of California Penal Code Section 211, and three counts of Receiving Stolen Property, in violation of California Penal Code Section 496D(a), in the Superior Court for the State of California, County of Riverside, case number RIF1301888, on or about July 6, 2014.  This conviction included a sentencing enhancement for committing a felony while released on bond under California Penal Code Section 12022.1.  On one of the Receiving Stolen Property counts, MOSLEY was sentenced to 6 years' prison.  On the remaining counts, he was sentenced to 1 year and 4 months' prison.

**I. Background and Criminal History of PELAYO**

31.  On or about September 25, 2022, I reviewed certified conviction records for PELAYO and learned that PELAYO has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   Elder or Dependent Adult Abuse Likely to Produce Great Bodily Harm, in violation of California Penal Code Section 368(b)(1), in the Superior Court for the State of California, County of San Bernardino, case number FSB059276, on or about January 23, 2007.  In this case, a charge of Second Degree Robbery, in violation of California Penal Code Section 211, involving the same victim of the count of conviction, was dismissed on motion of the prosecution pursuant to a plea bargain.  PELAYO was sentenced to 3 years' prison in this case.

b.   Possession for Sale of Cocaine Base, in violation of Health and Safety Section 11351.5, in the Superior Court for the State of California, County of San Bernardino, case number FSB700427, on or about March 7, 2007.  PELAYO was sentenced to 3 years' prison in this case.

c.   Resisting an Officer, in violation of California Penal Code Section 69, in the Superior Court for the State of California, County of San Bernardino, case number FSB702124, on or about October 31, 2007.  PELAYO was sentenced to 3 years' prison in this case.

d.   Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of San Bernardino, case number FSB1304092, on or about

17

September 20, 2013.  PELAYO was sentenced to 5 years' prison in
this case.  PELAYO pleaded guilty to a count that included an
allegation that the offense was a "serious felony" because
PELAYO personally used a "knife" during the commission of the
robbery.

      **J.    Interstate Nexus of Handgun and Ammunition**

      32.   On September 9, 2022, FBI SA Austin Hunter, who is
trained as an expert in the nexus of firearms and ammunition,
examined the handgun and ammunition loaded within the handgun
that were recovered from the dumpster during the investigation
of the April 7, 2022 robbery.  SA Hunter confirmed that the
handgun and ammunition were manufactured outside of the State of
California.  Because the handgun and ammunition were found in
California, I believe that the handgun and ammunition has
traveled in and affected interstate commerce.

      **K. MOSLEY Has Lived at SUBJECT PREMISES A for Years**

      33.   Based on a search of records from the Department of
Motor Vehicles ("DMV"), SA Banuelos learned that MOSLEY reported
SUBJECT PREMISES A as his Residence.  Further investigation
through CLEAR and Accurint databases revealed MOSLEY has resided
at SUBJECT PREMISES A for 11 years.

      34.   On September 9, 2022, at approximately 1:50 p.m.
members of the IVCSTF were surveilling SUBJECT PRESMISES A.
Task Force Officer ("TFO") Mike Madrigal saw MOSLEY drive into
the area, park, and exit a white Nissan Rogue with California
license plate number 7R0P609, registered to Q.B.  TFO Madrigal

saw MOSLEY exit the white Nissan Rogue and walk up a stairway leading to SUBJECT PRESMISES A.

35.  On September 20, 2022, at approximately 4:00 p.m. members of the IVCSTF were surveilling SUBJECT PRESMISES A.  TFO Madrigal saw MOSLEY drive into the area, park, and exit a white Nissan Rogue with California license plate number 7R0P609, registered to Q.B.  TFO Madrigal saw MOSLEY exit the white Nissan Rogue and walk up a stairway leading to SUBJECT PRESMISES A.

**L.  PELAYO Resides at SUBJECT PREMISES B**

36.  CLEAR and Accurint database information as well as surveillance revealed PELAYO resides at SUBJECT PREMISES B.

37.  On September 8, 2022, at approximately 4:50 a.m. members of the IVCSTF set up surveillance around SUBJECT PRESMISES B.  TFO Chris Angelo surveilled a black Dodge Challenger with California license plate number 9BCP114, registered to PELAYO, parked in the driveway of SUBJECT PREMISES B and saw PELAYO exit SUBJECT PREMISES B and enter the Challenger and depart the area.

38.  On September 21, 2022, at approximately 4:30 a.m. members of the IVCSTF were set up surveilling SUBJECT PRESMISES B.  SA Banuelos surveilled a black Dodge Challenger with California license plate number 9BCP114, registered to PELAYO, parked in the driveway of SUBJECT PREMISES B and I saw PELAYO exit SUBJECT PREMISES B and enter the Challenger and depart the area.

## V.  <u>TRAINING AND EXPERIENCE ON ARMED ROBBERY INVESTIGATIONS</u>

39.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct armed robbery investigations, I am aware of the following:

a.  Persons who commit armed robbery often wear generic-appearing attire while committing robberies so they do not appear conspicuous on surveillance video.  During robbery investigations, investigators pay close attention to every item of clothing that can be seen in surveillance videos to identify similarities and to help identify suspects.  During the execution of a robbery search warrant, law enforcement officers pay special attention to the attire found in a location to be searched to look for similarities between attire seen on surveillance video and attire worn during a robbery.  Attire found in a residence that appears to match attire as captured in surveillance video footage of a robbery is important evidence in a robbery investigation.

b.  Armed robbers often keep records concerning the plans to rob a targeted business.  For example, robbers will often scout locations before a robbery to identify non-peak hours and vulnerabilities of their targeted robbery location. Records concerning a planned robbery could include images of the target location, evidence of calls to the target location, evidence of visits to the target location in the days and weeks leading up to the robbery, and notes of details learned about potential robbery targets.

c.    Armed robbers often keep records after an armed robbery.  For example, robbers will often keep or generate records concerning the cash or merchandise robbed.  Robbers may have ledgers concerning the cash or merchandise robbed, how robbery proceeds are divided, or they may have records of purchases made in the wake of their robberies.

d.    Persons who possess, purchase, or sell firearms used to commit violent crimes generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

e.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

f.    Those who possess and use firearms in furtherance of crime often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media

21

message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices. These individuals frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

g.   Individuals engaged in the purchase or sale of firearms to be used in furtherance of violent crime, and other contraband, often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

     a.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MOSLEY and PELAYO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MOSLEY and PELAYO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

44.   For all of the reasons described above, there is probable cause to believe that MOSLEY and PELAYO have committed violations of 18 U.S.C. §§ 2113(a), (d) (Armed Credit Union Robbery) 924(c)(1)(A)(ii) (Brandish a Firearm in Furtherance of, and During and in Relation to, a Crime of Violence), and 2(a) (Aiding and Abetting).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A-1 and A-3 and the persons described in Attachment A-2 and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of
September, 2022.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

26